FILED

02/03/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 12, 2021 Session

## MOORE FREIGHT SERVICES, INC. v. GRANT MIZE ET AL.

**Interlocutory Appeal from the Chancery Court for Knox County**
**No. 200177-1          John F. Weaver, Chancellor**

_____

### No. E2021-00590-COA-R9-CV

_____

This is an interlocutory appeal involving a discovery dispute. The plaintiff corporation initiated this action to enforce a non-competition provision in an employment agreement, naming as defendants the plaintiff's former chief operating officer and his current employer. Central to the discovery dispute, the plaintiff averred that it had terminated the chief operating officer's employment for cause based on having learned that he had been involved in a payment scheme involving benefits and favors to an employee of one of the plaintiff's customers. The defendants averred that the employment termination had actually been due to the plaintiff's corporate restructuring. Prior to the chief operating officer's employment termination, the plaintiff had retained outside counsel to conduct an internal investigation, and the customer whose employee had been identified as the recipient of the scheme had likewise conducted an investigation. Upon the defendants' motion to compel discovery of materials related to the plaintiff's internal investigation, the plaintiff opposed the motion, asserting that the materials were entitled to protection pursuant to the attorney-client privilege, common interest privilege, and work product doctrine. Following a hearing, the trial court found that the defendants had established, *prima facie*, that the plaintiff had waived the asserted privileges and protections by placing the internal investigation materials at issue in the litigation. The trial court then conducted an in camera review of specific materials presented to the court during the final day of the hearing. At the time these materials were submitted, it was undisputed that the only attorney work product included in the materials was "fact" or "ordinary" work product with no "opinion" work product included. Following in camera review, the trial court entered an order granting the motion to compel specifically as to the materials it had reviewed. Upon the plaintiff's motion, the trial court entered an agreed order granting permission for application to this Court for an interlocutory appeal addressing the certified issue of whether the plaintiff had "waived the work product, attorney-client, and common interest privilege or protection by placing the internal investigation 'at issue' in this litigation." This Court subsequently granted permission for interlocutory appeal.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Michael K. Alston, Samantha Lunn, and K. Chris Collins, Chattanooga, Tennessee, for the appellant, Moore Freight Services, Inc.

Wayne A. Ritchie, II; James R. Stovall; and Samantha I. Ellis, Knoxville, Tennessee, for the appellee, Grant Mize.

Matthew A. Grossman and Rebekah P. Harbin, Knoxville, Tennessee, for the appellee, TLD Logistics Services, Inc.

**OPINION**

I.  Factual and Procedural Background

The co-defendant, Grant Mize, was the president and operations manager of the plaintiff corporation, Moore Freight Services, Inc. ("Moore Freight"), prior to Moore Freight's acquisition by Daseke Companies, Inc. ("Daseke") in 2017. As part of the acquisition, Mr. Mize was to assume the role of chief operating officer ("COO") with Moore Freight and entered into an employment agreement ("the Employment Agreement") with Moore Freight to this effect on December 1, 2017.[1] The Employment Agreement, which sets forth an initial five-year term and includes a non-competition clause, provides in pertinent part:

> 1.      Employment; Capacity and Duties.
>
> * * *
>
> 1.4      During the Employment Term, Employee covenants and agrees to serve the Company as its Chief Operating Officer and to do and perform any and all services and acts necessary to properly manage and conduct the affairs, activities and business of the Company

---

[1] In his answer to Moore Freight's complaint, Mr. Mize acknowledged that his signature appears on the signature page of the Employment Agreement but challenged whether he had been presented with the entire document when he executed his signature.

subject to the direction and control of the Daseke Management. In his capacity as Chief Operating Officer, Employee shall devote his full business attention, ability and effort to the business of the Company. Employee shall endeavor in good faith to perform his duties in an efficient, faithful and business-like manner. Employee shall not, without the prior written approval of the Daseke Management, engage in any other material business activity; provided, however, that Employee may (a) engage in civic, charitable, religious, personal activities and outside passive investments, and (b) engage in other minor business activities so long as such activities are not in competition with or otherwise create a conflict of interest with Daseke or any of its direct or indirect subsidiaries (collectively, the "Daseke Companies") and such activities do not materially interfere with Employee's ability to perform his duties.

2.      Employment Term.

2.1     Unless sooner terminated pursuant to other provisions of this Agreement, the Company agrees to employ Employee for the period beginning on the Effective Date and ending on five year anniversary of the Effective Date (the "Primary Employment Period"). . . .

* * *

3.      Compensation.

3.1     As compensation for his employment services during the portion of the Employment Term preceding Employee's termination of employment (the "Service Period") hereunder, Employee shall receive an initial annualized base salary of $200,000 (subject to deductions for tax and other withholdings) (the "Base Salary") payable in accordance with the Company's customary payroll practices, prorated for any partial employment period. The Daseke Management may from time to time, but no less than annually, review and increase (but not decrease) the Base Salary in its sole discretion.

* * *

5. Termination.

5.1 Right to Terminate. Notwithstanding the provisions of Section 2.1, Employee's employment by the Company shall automatically terminate upon the death of Employee, and the Company and Employee shall have the right to terminate Employee's employment under this Agreement at any time for any of the following reasons:

* * *

(b) by the Company for "Cause," which for purposes of this Agreement means Employee (i) has been convicted of, or pleaded guilty or no contest to, a misdemeanor involving moral turpitude or a felony, (ii) has engaged in conduct which is materially injurious (monetarily or otherwise) to the Company or any Company affiliate (including, without limitation, misuse of any of the Company's funds or other property, fraud, or theft), (iii) has engaged in gross negligence or willful misconduct in the performance of Employee's duties, (iv) has willfully refused without proper legal reason to perform Employee's duties, which refusal continues for a period of thirty (30) days after a written demand for specific performance has been delivered to Employee specifically identifying said duties Employee has refused to perform, or (v) has materially breached this Agreement or any Company policy (including, without limitation, the policy against discrimination and harassment);

* * *

5.2 Effect of Termination.

* * *

(b) Upon termination of Employee's employment hereunder by the Company for Cause, Employee shall be entitled to receive the Accrued Obligations. Employee shall, subject to the last sentence of this Section 5.2(b), have no further rights to any

- 4 -

compensation (including any Base Salary or Annual Bonus) or any other benefits under this Agreement. All other benefits, if any, due Employee following termination of Employee's employment hereunder by the Company for Cause shall be determined in accordance with the plans, policies, and practices of the Company and any applicable statute or regulation.

\* \* \*

6. Non-Competition Agreement and Statements Concerning the Company.

6.1 Non-Competition Agreement. Employee agrees that during the Employment Term and for two years following the Termination Date or the duration of the Severance Period, whichever is longer (the "Restricted Period"), Employee shall not, in a Restricted Capacity, directly or indirectly engage in or cooperate with any person or entity engaged in the Business within the Restricted Area. For purposes of this Agreement, "Restricted Capacity" means any role, whether as an employee, contractor, consultant, owner, or otherwise (a) having responsibilities or duties similar to those Employee held during the Employment Term, (b) having responsibility or oversight, whether direct or indirect, for any aspect of a business for which Employee had responsibility during the Employment Term, or (c) involving the potential use of the Company's confidential or Proprietary Information; the "Business" means the business of flatbed and open deck trucking and logistics; and the "Restricted Area" means the United States. Employee further agrees that during the Restricted Period, Employee shall not, directly or indirectly, (i) solicit for employment or employ any individual who was an employee or contractor of the Company within the two year period predating the Termination Date or (ii) solicit for business, induce, or entice away a customer of the Company or a Company affiliate that is or was a customer at any time during the period during which Employee is or was employed by the Company.

6.2 <u>Employee's Acknowledgments Regarding Scope of the Non-Compete</u>. Employee agrees that he is a high-level executive who is responsible for all aspects of the Company's business and operations, he will be provided with access to trade secrets and Proprietary Information of the Company and of Daseke, and that the restrictive covenants included here are reasonable and necessary. Employee acknowledges that, in light of the scope of his duties under this Agreement, the Restricted Capacity will prevent him from working in the Business in most capacities other than, by way of example only, positions such as mechanic or driver; that because Daseke operates throughout the United States and in Canada and Mexico, the Restricted Area constitutes an area lesser in scope than what would be reasonable in light of his knowledge and involvement with Daseke; and that the limitations as to time, geographical area and scope of activity to be restrained are reasonable to protect the legitimate business interests of the Company including, without limitation, the Company's and its affiliates' goodwill, trade secrets and private and confidential information and that Employee is receiving adequate compensation for such restrictions. Employee represents that he has read, been advised by counsel and understands and agrees to be bound by the terms of this <u>Article 6</u>. Notwithstanding the foregoing, nothing contained in this Agreement shall prohibit Employee from purchasing and holding as a passive investment less than 5% of any class of the issued and outstanding and publicly traded (on a recognized national or regional securities exchange or in the over-the-counter market) security of any corporation, partnership or other business entity that conducts a business in competition with the Company or any of the Company's affiliates.

6.3 <u>Statements Concerning the Company</u>. Employee shall refrain, both during and after the Employment Term, from publishing any oral or written statements about the Company, any of its affiliates, or any of the Company's or such affiliates' directors, officers, employees, consultants, agents, representatives, customers, or suppliers that (a) are disparaging, slanderous, libelous, or defamatory, (b) disclose Proprietary Information (as defined below), or (c) place the Company, any of its affiliates, or any of the Company's or any such

affiliates' directors, officers, employees, consultants, agents, or representatives in a false light before the public.

The Employment Agreement also contains, *inter alia*, specific provisions concerning Mr. Mize's knowledge obtained during his employment with Moore Freight, including provisions entitled, "Confidentiality," "Proprietary Information," and "Inventions and Innovations."

Moore Freight terminated Mr. Mize's employment, purportedly for cause, on November 7, 2019, slightly less than two years into Mr. Mize's five-year term under the Employment Agreement. His termination followed an internal investigation into what Moore Freight terms a "bribery scheme," consisting of "cash payments, meals, personal items, used cars, and vacation packages" purportedly provided by Mr. Mize to "a key employee" of one of Moore Freight's customers ("Customer").[2] Moore Freight had retained outside counsel, Vinson & Elkins, to conduct the internal investigation. Vinson & Elkins is not representing Moore Freight in the instant action.

For his part, Mr. Mize asserts that the bribery allegation was a pretext for eliminating his position as COO. Defendants state on appeal that the investigation was related to a "practice" begun under Moore Freight's previous owner of "providing favors to the primary contact" of Customer. Although the parties characterize this fact differently, it is undisputed that the investigation was prompted by Mr. Mize's voluntary disclosure to Scott Hoppe, another executive within the Daseke network, of the practice of providing cash and favors to Customer's contact.[3] As part of the investigation, Mr. Mize executed a "witness statement" in October 2019, detailing his knowledge of the payment scheme to Customer. He maintains that when he executed the witness statement, he was told that he was not a subject of the investigation. In a letter notifying Mr. Mize of his employment termination, dated November 7, 2019, Mr. Hoppe stated in part: "The Company [Moore Freight] acknowledges your assistance with the Company's investigation; nevertheless the Company has concluded that you engaged in conduct materially injurious to the Company deemed as willful misconduct in the performance of your duties."

---

[2] Given Customer's status as a non-party to the instant action and the interlocutory nature of this appeal, we have chosen not to identify Customer by name in this Opinion. No disrespect is intended.

[3] According to affidavits executed in October 2020 respectively by Soumit Roy, Daseke's in-house counsel, and Mr. Hoppe, Daseke was the "parent company" to both Moore Freight and E.W. Wylie Corp. ("E.W. Wylie"), which was the affiliate for which Mr. Hoppe was the chief executive officer. Mr. Hoppe stated that in January 2020, E.W. Wylie had "absorbed [Moore Freight] operationally" although Moore Freight continued its separate corporate existence.

Following his termination from Moore Freight, Mr. Mize accepted a position in February 2020 with the co-defendant, TLD Logistics Services ("TLD"). According to Mr. Mize and TLD (collectively, "Defendants"), Mr. Mize attended a six-week driver training school to earn a commercial driver's license and began driving a "shunt truck" for TLD in Laurinburg, North Carolina, in April 2020, earning approximately $80,000 per year. Although Defendants differentiate the type of operation Mr. Mize is involved in with TLD from the type of operation conducted by Moore Freight, they acknowledge that Mr. Mize obtained this position in part through longstanding contacts he had in the industry. One of these contacts was employed by NSG Pilkington ("Pilkington"), described by Defendants as "a large glass and glazing system manufacturer," which had a need for "shunting" work, defined by Defendants as "loading product at a plant onto trailers and positioning (driving) the trailers in the yard so they can be connected to the tractors of the various carriers that will transport the product to the plant's customers." In December 2019, TLD submitted a proposal to take over shunting work at Pilkington's Laurinburg location and was awarded the work in January 2020. According to Defendants, TLD's proposal was made in the context of a void created by another company when it halted shunting work for Pilkington.

On May 14, 2020, Moore Freight filed a verified complaint in the Knox County Chancery Court ("trial court"), naming Mr. Mize and TLD as defendants and alleging that Mr. Mize's employment with TLD was in violation of the non-competition and non-solicitation provisions of the Employment Agreement. Specifically against Mr. Mize, Moore Freight alleged breach of the Employment Agreement and requested an award of monetary damages for lost revenue, injunctive relief, and pre- and post-judgment interest. Regarding the result of the internal investigation, Moore Freight averred as follows in what was labeled paragraph 48 of the complaint (subsequently referred to by the trial court by paragraph number):

> After reviewing all of the information available, it was determined that the severity of the conduct, the potential damage that could have been (or was) caused to [Moore Freight's] customer relationships, which are built on trust, and other substantial harm that could have been caused to [Moore Freight] and Daseke, made it impossible for Mize and the other employees involved in the scheme to remain employed by [Moore Freight].

Concerning injunctive relief, Moore Freight stated in the complaint: "While the Employment Agreement contains a mandatory arbitration provision regarding any dispute or controversy arising under the Employment Agreement, it is expressly subject

to Section 11.11, which entitles [Moore Freight] to injunctive relief and specific performance for violations of certain applicable sections of the Employment Agreement." Against TLD, Moore Freight alleged tortious interference with a contract and requested an award of monetary damages for lost revenue, injunctive relief, and pre- and post-judgment interest.

Moore Freight filed a motion for temporary injunction on July 13, 2020, pursuant to Tennessee Rule of Civil Procedure 65.04, requesting that Mr. Mize be enjoined from "continuing to work for TLD in any of the restricted capacities set forth in the Employment Agreement" and "continuing to provide services to Pilkington on behalf of TLD or any other direct competitor of [Moore Freight]." Moore Freight also requested that TLD be enjoined from "continuing to facilitate Mize's breach of the Employment Agreement by employing him in any of the restricted capacities set forth in the Employment Agreement" and "continuing to provide any services to Pilkington that it was not providing prior to Mize's termination from [Moore Freight], including, but not limited to, any services currently being provided by TLD at Pilkington's Laurinburg, North Carolina facilities." Mr. Mize subsequently filed a response opposing Moore Freight's motion for a temporary injunction.

TLD filed an answer to the complaint on July 21, 2020, denying all liability and raising affirmative defenses of (1) failure to state a claim upon which relief can be granted, (2) the doctrine of unclean hands, (3) lack of compensable injury or damages, (4) Moore Freight's actions as the cause of any alleged damages to itself, (5) failure to mitigate damages, (6) waiver, (7) estoppel, (8) failure of Employment Agreement for lack of consideration, (9) invalid choice of Texas law in Employment Agreement, and (10) unenforceability of Employment Agreement provisions. Proceeding under separate counsel, Mr. Mize filed an answer and counterclaim on August 18, 2020. In his answer, Mr. Mize denied that Moore Freight was entitled to any relief and raised affirmative defenses of (1) failure to state a claim upon which relief could be granted, (2) the doctrine of first material breach of contract, (3) the doctrine of unclean hands, (4) lack of compensable injury or damages, (5) Moore Freight's actions as the cause of any alleged damages to itself, (6) failure to mitigate damages, (7) requirement that any damages suffered by Moore Freight be offset by damages suffered by Mr. Mize, (8) unenforceability of Employment Agreement provisions, and (9) entitlement to reasonable attorney's fees under Texas law.

In his counterclaim, Mr. Mize alleged (1) breach of contract, asserting that Moore Freight was liable for $600,000 in unpaid compensation because his employment was not terminated for cause; (2) entitlement to reasonable attorney's fees pursuant to Texas law

purportedly governing the Employment Agreement; and (3) unenforceability of the Employment Agreement, particularly Article 6.1.  Mr. Mize sought $600,000 in damages; pre- and post-judgment interest; a declaration that the Employment Agreement, specifically Article 6.1, was unenforceable; and reasonable attorney's fees.

Moore Freight filed an answer to Mr. Mize's counterclaim on October 12, 2020, denying all liability and asserting affirmative defenses of (1) failure to state a claim upon which relief could be granted; (2) the doctrines of estoppel, laches, and/or waiver; (3) the doctrines of consent and/or acquiescence; (4) lack of compensable loss or damages; (5) Mr. Mize's actions as the cause of any damages to himself; (6) the doctrine of first material breach of the Employment Agreement; (7) lack of breach of the Employment Agreement on Moore Freight's part; (8) the doctrine of unclean hands; (9) failure to mitigate damages; (10) the Statute of Frauds; (11) entitlement to reasonable attorney's fees pursuant to Texas law; and (12) replacement of any previous oral agreement by the written Employment Agreement.

On October 13, 2020, Defendants filed a motion to compel responses from Moore Freight to discovery requests, as well as a "Motion to Strike or Disallow Plaintiff's Motion for a Temporary Injunction and to Set a Merits Hearing."[4]  Moore Freight filed responses objecting to these motions.  On November 12, 2020, Defendants filed an amended motion to compel responses to discovery requests, acknowledging that Moore Freight had provided some "perfunctory" responses while alleging that these responses were "grossly insufficient."  Following a hearing conducted on November 19, 2020, the trial court entered an order on January 11, 2021, *nunc pro tunc* to the hearing date, *inter alia*, directing Moore Freight to produce "all responsive, nonprivileged documents in [its] custody, control or possession" by November 27, 2020, and "supplement its response[s]," "subject to remaining attorney client privilege and work product objections" by November 25, 2020, in response to Defendants' discovery requests.  The court also directed Moore Freight to "produce a privilege log for all responsive documents," "reasonably identify[ing] in said privilege log the type of document withheld, the subject matter of the document, the date of said document(s)' creation, and the nature of the privilege asserted."

In the meantime, Defendants had also filed a joint motion to compel cooperation in setting depositions and for an extension of time to respond to discovery.  Moore Freight and Daseke responded by filing a joint motion for a protective order limiting topics in the depositions requested by Defendants. Upon Moore Freight's and Daseke's subsequent filing of a motion for a protective order regarding "confidential discovery

---

[4] In October 2020, Mr. Mize also filed a motion for jury trial.

material," the trial court entered a "Joint Stipulation for Entry of Protective Order and Protective Order Regarding Confidential Discovery Material" on December 4, 2020, memorializing an agreement among the parties that documents collected in discovery could be deemed by a designating party to be "confidential" with disclosure allowed only to the parties, their counsel, and their respective agents. The protective order also allowed for materials to be designated, "Highly Confidential Discovery Material," with the legend, "Attorneys' Eyes Only," to be placed on the face of such materials.[5]

The motion primarily at issue on interlocutory appeal was filed by Defendants on January 7, 2021, and was entitled, "Defendants' Motion to Compel Production of Internal Investigation Materials." In this motion, Defendants averred that "[t]he materials regarding the investigation are directly relevant to Mr. Mize's defense that his termination was pretextual and that [Moore Freight's] demoting or removing him as CEO of [Moore Freight] and ultimately terminating him constitute first material breaches of his employment agreement." Noting that Moore Freight had "refused to produce the requested information and documents on the ground that they are protected by the attorney-client privilege, common-interest privilege, and work-product doctrine," Defendants asserted that these grounds lacked merit and that Moore Freight had not provided a detailed description of the items withheld pursuant to Tennessee Rule of Civil Procedure 26.02(5). Moore Freight filed a response to the motion to compel internal investigation materials on January 21, 2021, asserting that it should not be required to produce documents related to the internal investigation because they were protected by (1) the work product doctrine as to the internal investigation, (2) the common interest doctrine as to information regarding the investigation shared with Customer, (3) and the work product doctrine as to Vinson & Elkins. Moore Freight further asserted, *inter alia*, that Defendants' claims had not placed the internal investigation at issue. Moore Freight attached a "privilege log" listing twenty-two items from Daseke's "Investigation Files" with claimed privileges related to each. In a motion for an *in limine* order filed on

_____

[5] Concerning deposition matters, Defendants filed an additional motion to compel on January 19, 2021, requesting that the trial court direct Moore Freight to "produce an appropriate corporate representative" of Daseke in addition to the individual Moore Freight had previously produced, Derek Blount, who was the former Senior Vice President of Daseke. Moore Freight responded with an objection and motion for protective order filed the same day, asserting, *inter alia*, that Defendants had issued a "renewed" notice of deposition that added new topics and was overly burdensome. Defendants subsequently filed a " Motion *in Limine* and/or for Relief under Rule 37 and to Preclude the Use or Introduction of Information not Properly Disclosed during Discovery," asserting, *inter alia*, that Moore Freight had produced for deposition a second corporate representative, Tracy Buzick, who had been recently hired by Wiley as a safety director in 2018 and had no firsthand knowledge of Moore Freight's operations. The record does not indicate any resolution to the parties' dispute regarding depositions at the time of this interlocutory appeal.

January 25, 2021, Defendants again asserted that Moore Freight had failed to produce all of its responsive documents pursuant to the trial court's ruling following the November 2020 hearing.

The trial court conducted a hearing concerning Defendants' motion to compel over the course of two days on January 22 and 26, 2021. Prior to the second day of the hearing, the parties filed supplemental briefs upon the trial court's request regarding whether Moore Freight had waived the privileges it claimed by placing the internal investigation at issue. In an order entered on February 24, 2021, the court noted that "[a]t the conclusion of the hearing on January 26, 2021, the Court rendered its ruling upon [Moore Freight's] claim of privilege and adjourned for an *in camera* review of the materials turned over to the court that day." In the February 2021 order, the court stated that it had completed the *in camera* review and set the matter for hearing on March 4, 2021. The court expressly incorporated the transcript of its January 26, 2021 ruling into the February 2021 order. Following the March hearing, the court entered an "Order Granting Defendants' Motion to Compel Production of Internal Investigation Materials" on April 15, 2021. The court expressly incorporated into the April 2021 order its February 2021 order, complete with transcript excerpt, and the transcript of its ruling from the March 2021 hearing.

In granting Defendants' motion to compel in the April 2021 order, the trial court concluded and directed as follows:

> After review of the Motion, the Opposition filed thereto, the supplemental briefing from both parties, and the arguments of counsel, and based on its in camera review, the Court finds that [Moore Freight] has placed the internal investigation at issue in this action. Because [Moore Freight] has placed the internal investigation at issue in this action, [Moore Freight] has waived any attorney-client, work product, or common interest or joint defense privilege or protection over the documents, information, or communications prepared as part of the internal investigation. Consistent with these findings and the Court's bench opinion on January 24, 2021,[6] the Court finds that the materials given to the Court on January 26, 2021, for an *in camera review* should be turned over to Defendants in their entirety.

It is therefore **ORDERED**, **ADJUDGED** and **DECREED** that

---

[6] The date stated here of January 24, 2021, appears to be a typographical error. The trial court had memorialized its January 26, 2021 bench opinion by incorporating it into its February 24, 2021 order.

1. Defendants' Motion to Compel Production of Internal Investigation Materials is granted in its entirety;

2. [Moore Freight] has waived and may not assert any attorney-client privilege, attorney work product or joint defense protection over any documents, information or communication prepared as part of the internal investigation referenced in paragraph 40-49 of [Moore Freight's] Complaint;

3. [Moore Freight] shall provide full responses to Interrogatory 4 and Requests for Production 1 and 2 in Defendant Mize's second set of discovery requests (the "Internal Investigation Discovery Materials") within 15 days of the entry of this Order, including documents labeled "VE BINDERS 001-375" and "VE_AGCPRIV 001-681";

4. The Internal Investigation Discovery Materials and their content shall be deemed confidential and shall not, without leave of this Court, be made available to anyone other than:

    a. this Court;

    b. the Appellate Courts of Tennessee;

    c. the parties in this action;

    d. the parties' counsel;

    e. deponents in the course of taking their depositions in this action; and

    f. witnesses in the trial of this action in the course of trial examination of those witnesses.

5. Defendants may seek the additional materials referenced by [Moore Freight's] counsel at the January 26, 2021 hearing,

but not produced for *in camera* review, upon further motion to this Court.

6.      After termination of this action, Defendants shall assemble all Internal Investigation Discovery Materials, including any documents, summaries, electronic records or abstracts containing any of the contents, in Defendants' possession, custody or control for return to [Moore Freight] or destruction at the direction of [Moore Freight] and Defendants thereafter shall submit certification to the Court in writing that Defendants have complied with these procedures.

On March 26, 2021, in the interim between the March 4, 2021 hearing and entry of the order granting the motion to compel, Moore Freight filed a "Motion for Interlocutory Appeal Regarding Court's Ruling from January 26, 2021, Hearing." The trial court subsequently entered an agreed order granting Moore Freight's motion for permission to file an interlocutory appeal and certifying a single issue for appellate review. In an order entered on June 15, 2021, this Court granted Moore Freight's Tennessee Rule of Appellate Procedure 9 motion for interlocutory appeal.

## II. Issue Presented

Pursuant to Tennessee Rule of Appellate Procedure 9, "we are limited on appeal to the questions certified by the trial court in its order granting permission to seek an interlocutory appeal and in this Court's order granting the appeal." *In re Bridgestone/Firestone & Ford Motor Co. Litig.*, 286 S.W.3d 898, 902 (Tenn. Ct. App. 2008) (citing Tenn. R. App. P. 9). The trial court's order and this Court's order granting interlocutory appeal present the following issue for our review:

Whether Moore Freight waived the work product, attorney-client, and common interest privilege or protection by placing the internal investigation "at issue" in this litigation.

## III. Standard of Review

This interlocutory appeal presents a question involving the scope of pre-trial discovery permitted by the trial court and whether Moore Freight has waived application of the work product doctrine, attorney-client privilege, or common interest privilege to limit that scope. We note that Tennessee appellate courts have "recognize[d] the

- 14 -

common interest privilege as an extension of the attorney-client privilege." *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002). "Decisions regarding discovery issues address themselves to a trial court's discretion, as do decisions regarding the application of the attorney-client privilege and work product doctrine." *Id.* at 211 (internal citations omitted). As our Supreme Court has elucidated concerning the abuse of discretion standard of review:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

> Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d [22,] 42 [(Tenn. 2005)].

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524-25 (Tenn. 2010).

However, "[g]enerally, the issue of whether a party has waived a privilege is a mixed question of law and fact, subject to *de novo* review." *Culbertson v. Culbertson*, 455 S.W.3d 107, 125 (Tenn. Ct. App. 2014) ("*Culbertson II*"). As this Court has explained:

In applying this standard, we first determine whether the facts on which the claimed waiver is based are supported by a preponderance of the evidence in the record. We then determine, as a question of law, whether the facts as supported by a preponderance of the evidence constitute a waiver of the privilege. *See Knipe Land Co. v. Robertson,* 151 Idaho 449, 259 P.3d 595, 603-04 (2011); *Cullen v. Valley Forge Life Ins. Co.,* 161 N.C. App. 570, 589 S.E.2d 423, 428 (2003) (quoting *Hicks v. Home Sec. Life Ins. Co.,* 226 N.C. 614, 39 S.E.2d 914 (1946)); *see also Advantor Capital Corp. v. Yeary,* 136 F.3d 1259, 1267 (10th Cir. 1998) ("Whether facts on which a claim of waiver is based have been proved, is a question for the trier of the facts, but whether those facts, if proved, amount to a waiver is a question of law."); *Johnson v. Rogers Mem. Hosp., Inc.,* 283 Wis. 2d 384, 700 N.W.2d 27, 36 (2005) (noting that, when relevant facts are undisputed, issue of whether patient waived therapist-patient privilege is pure question of law).

*Id.* at 125-26.

IV.  Waiver of Privileges and Protections

Moore Freight contends that the trial court erred in finding that it had waived the attorney-client privilege, common interest privilege, and work product doctrine invoked by Moore Freight to protect the materials related to its internal investigation by placing the internal investigation "at issue" in this action.  Moore Freight also asserts that the trial court erred by applying the same at-issue test to analyze waiver in the context of the work product doctrine as the court applied to its analysis of waiver in the context of the attorney-client and common interest privileges.  Defendants assert that the trial court properly found that Moore Freight had placed the internal investigation at issue as the purported cause of Mr. Mize's employment termination and had thereby waived all of the privileges it sought to assert as protection of the subject documents.  Upon thorough review of the record and applicable authorities, we conclude that the trial court did not err in finding that Moore Freight waived the attorney-client privilege, common interest privilege, and work product doctrine protections specifically regarding the materials reviewed by the trial court in camera and included in its final order.

The attorney-client privilege protects communications between attorney and client, as does its extension via the common interest privilege, which also may protect the "pooling of information among attorneys representing parties sharing a common legal interest in litigation."  *See Boyd*, 88 S.W.3d at 213.  In contrast, the work product doctrine operates to protect the work produced by attorneys, "embod[ying] the policy that attorneys, doing the sort of work that attorneys do to prepare a case for trial, should not be hampered by the prospect that they might be called upon at any time to hand over the results of their work to their adversaries."  *Id.* at 219.  Moore Freight urges this Court to "expressly identify that attorney-client privilege and work-product protections, two distinct doctrines, require two separate and distinct tests to assess waiver under the 'at issue' doctrine.'"  Although we agree that the doctrines are distinct, we find them to be related, in part because both require a similar burden-shifting analysis, and we decline to accept Moore Freight's invitation in this regard.

"The law favors making all relevant evidence available to the trier of fact."  *Boyd*, 88 S.W.3d at 213.  Regarding the scope of discovery, Tennessee Rule of Civil Procedure 26.02(1) generally provides in pertinent part:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and electronically stored information . . . .

Concerning the shifting burdens of proof involved in a discovery dispute such as the one at bar, this Court has explained:

To resolve issues pertaining to the discovery of an adversary's claim of work product or privilege, the trial court and the parties are to follow sequential steps, which entail shifting burdens of proof. *Boyd*, 88 S.W.3d at 220-222 (citing *Hendrick v. Avis Rent A Car Sys.,* 916 F. Supp. 256, 260 n.3 (W.D.N.Y. 1996); *In re Air Crash Disaster at Detroit Metro. Airport,* 130 F.R.D. 641, 644 (E.D. Mich. 1989)).

The party seeking discovery, has the burden to establish (1) that the material being sought is relevant to the subject matter involved in the pending action, (2) that the material being sought is not otherwise privileged, and (3) that the material being sought consists of documents or other tangible things. *Boyd*, 88 S.W.3d at 220 (citing *Toledo Edison Co. v. G A Techs., Inc.*, 847 F.2d [335,] 339 [(6th Cir. 1988)]; *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 306 (E.D. Mich. 2000); *Miller v. Federal Express Corp.,* 186 F.R.D. 376, 387 (W.D. Tenn. 1999)). Once the party seeking discovery establishes a prima facie showing that the materials it sought were discoverable, the burden shifts to the party opposing discovery to show that the materials were either privileged or work product protected by Tenn. R. Civ. P. 26.02(3). *Boyd,* 88 S.W.3d at 220-221 (citing *Hammock v. Sumner County*, No. 01A01-9710-CV-00600, 1997 WL 749461, at *2 (Tenn. Ct. App. Dec. 5, 1997)).

If it is established that a portion of the requested documents are subject to the attorney-client privilege, a protective order as to those documents is in order. Tenn. Code Ann. § 23-3-105. If it is established that a portion of the requested documents are work product, the burden shifts back to the party requesting discovery to establish that it is nonetheless entitled to the material. *Boyd*, 88 S.W.3d at 221.

*State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 602, 617-18 (Tenn. Ct. App. 2006) (footnotes and additional internal citation omitted); *see Culbertson v. Culbertson*, 393 S.W.3d 678, 683 (Tenn. Ct. App. 2012) ("*Culbertson I*") (quoting the burden-shifting analysis in *State ex rel. Flowers* in applying law related to the attorney-client privilege to the psychologist-client privilege).

In this case, it was initially Defendants' burden to establish a *prima facie* showing that the internal investigation materials were (1) relevant to the subject matter in the pending action, (2) not otherwise privileged, and (3) consisted of documents or other tangible things. *See State ex rel. Flowers*, 209 S.W.3d at 617. At this point in the analysis, "[t]he relevancy requirement is broadly construed to include any matter that bears on, or that reasonably could lead to other matters that could bear on any of the case's issues." *Id.* at 615. In averring in its complaint that Mr. Mize's employment had been terminated for cause under the Employment Agreement, Moore Freight stated that Soumit Roy, Daseke's in-house counsel; Mr. Hoppe; "and others reviewed the details disclosed by the investigation." In a paragraph of the complaint, cited by the trial court as "paragraph 48," Moore Freight then averred:

> After reviewing all of the information available, it was determined that the severity of the conduct, the potential damage that could have been (or was) caused to [Moore Freight's] customer relationships, which are built on trust, and other substantial harm that could have been caused to [Moore Freight] and Daseke, made it impossible for Mize and the other employees involved in the scheme to remain employed by [Moore Freight].

On appeal, Moore Freight insists that Mr. Mize's employment was terminated based solely on Mr. Mize's conduct related to the payment scheme as exposed by his revelation to Mr. Hoppe and by his witness statement, which was completed as part of the investigation. Moore Freight maintains that the remaining investigation materials are irrelevant to its claims under the complaint. However, given the broad construction of this initial relevancy requirement and particularly considering Mr. Mize's defense that his employment termination was actually due to a corporate consolidation and his counterclaim for breach of an agreement, we determine that Defendants met their initial burden in this regard.

No question exists as to whether the materials sought are tangible. As to whether the investigation materials are privileged, when Moore Freight opposed discovery of the materials, claiming the attorney-client privilege, common interest privilege, and work product doctrine, the burden shifted to Moore Freight to establish that the documents are

- 19 -

entitled to such protection. *See State ex rel. Flowers*, 209 S.W.3d at 617. At this point, it is helpful to examine each privilege or doctrine in turn, beginning with the attorney-client privilege and its extension, the common interest privilege.

## A. Attorney-Client and Common Interest Privileges

As noted in *Boyd*, Tennessee Rule of Evidence 501 "limits the ability of parties and witnesses to refuse to disclose information or documents to the 'privileges' provided by the constitution, statutes, common law, and rules promulgated by the Tennessee Supreme Court." *Boyd*, 88 S.W.3d at 212. In Tennessee, the attorney-client privilege is codified at Tennessee Code Annotated § 23-3-105 (2009), which provides:

> No attorney, solicitor or counselor shall be permitted, in giving testimony against a client or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person during the pendency of the suit, before or afterward, to the person's injury.

As the *Boyd* Court explained:

> This [attorney-client] privilege serves the administration of justice by encouraging full and frank communication between clients and their attorneys by sheltering these communications from compulsory disclosure. *Upjohn Co. v. United States,* 449 U.S. [383,] 389 [(1981)], 101 S. Ct. [677,] 682; *Bryan v. State,* 848 S.W.2d 72, 79 (Tenn. Crim. App. 1992).
>
> The attorney-client privilege is not absolute, nor does it cover all communications between a client and his or her attorney. The communications must involve the subject matter of the representation and must be made with the intention that they will be kept confidential. The privilege applies not only to the client's communications but also to the attorney's communications to his or her client when the attorney's communications are specifically based on the client's confidential communications or when disclosing the attorney's communications would, directly or indirectly, reveal the substance of the client's confidential communications. *Burke v. Tennessee Walking Horse Breeders' & Exhibitors' Ass'n,* No. 01A01-9611-CH-00511, 1997 WL 277999, at *11 (Tenn. Ct. App. May 28, 1997) (No Tenn. R. App. P. 11 application filed); *Bryan v. State,* 848 S.W.2d at 80.

The attorney-client privilege "belongs" to the client. *Smith County Educ. Ass'n v. Anderson,* 676 S.W.2d 328, 333 (Tenn. 1984); *State v. Parker,* 932 S.W.2d 945, 955 (Tenn. Crim. App. 1996). Accordingly, a client may waive the privilege either by communicating in the presence of others who are not bound by the privilege, *Hazlett v. Bryant,* 192 Tenn. [251,] 257 [(1951)], 241 S.W.2d [121,] 123, or by voluntarily divulging the communication to third parties. *Taylor v. State,* 814 S.W.2d 374, 377 (Tenn. Crim. App. 1991). It is also subject to exceptions grounded in public policy that do not depend on a client's waiver of the privilege. Tenn. S. Ct. R. 8, DR 4-101(C)(2), (4).

*Boyd*, 88 S.W.3d at 212-13 (footnotes omitted).

It is undisputed that Moore Freight retained outside counsel, Vinson & Elkins, to conduct the internal investigation during which the investigation materials sought by Defendants were created. The attorney-client privilege therefore belongs to Moore Freight as the client of Vinson & Elkins. "To invoke the protection of the attorney-client privilege, the burden is on the client to 'establish the communications were made pursuant to the attorney-client relationship and with the intention that the communications remain confidential.'" *Culbertson I*, 393 S.W.3d at 684 (quoting *State ex rel. Flowers*, 209 S.W.3d at 616). In addition to invoking the attorney-client privilege when refusing to produce the subject materials and responding to Defendants' motion to compel, Moore Freight also invoked the common interest privilege as to its sharing of investigation materials with Customer, who had conducted a contemporaneous internal investigation into the payment scheme and its effects.

Concerning the common interest privilege, this Court has previously explained in relevant part:

The common interest privilege recognizes the advantages of, and even necessity for, an exchange or pooling of information among attorneys representing parties sharing a common legal interest in litigation. *Transmirra Prods. Corp. v. Monsanto Chem. Co.*, 26 F.R.D. 572, 579 (S.D.N.Y. 1960). It extends the scope of the attorney-client privilege by providing an exception to the general rule that communications made in the presence of or shared with third parties are not protected by the attorney-client privilege. While the common interest privilege was originally applied in criminal cases, *Chahoon v. Commonwealth*, 62 Va. (21 Gratt.)

822 (1871), it has long since been extended to civil proceedings. *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129,* 902 F.2d 244, 249 (4th Cir. 1990); *Aiken v. Texas Farm Bureau Mut. Ins. Co.*, 151 F.R.D. 621, 623 (E.D. Tex. 1993); *Visual Scene, Inc. v. Pilkington Bros.*, 508 So.2d 437, 439 n.2 (Fla. Dist. Ct. App. 1987); *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 676 N.Y.S.2d [727,] 732 [(N.Y. Sup. Ct. 1998)]. The common interest privilege has been specifically recognized by the Tennessee Supreme Court. *Vance v. State*, 190 Tenn. 521, 529-30, 230 S.W.2d 987, 990-91 (1950).

* * *

The proponent of the common interest privilege has the burden of establishing the necessary elements of the privilege. *Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042-43 (10th Cir. 1998); *United States v. Evans*, 113 F.3d [1457,] 1467 [(7th Cir. 1997)]; *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993). To carry its burden, the proponent must demonstrate: (1) that the otherwise privileged information was disclosed due to actual or anticipated litigation, (2) that the disclosure was made for the purpose of furthering a common interest in the actual or anticipated litigation, (3) that the disclosure was made in a manner not inconsistent with maintaining its confidentiality against adverse parties, and (4) that the person disclosing the information has not otherwise waived the attorney-client privilege for the disclosed information. *In re Sealed Case,* 29 F.3d 715, 719 n.5 (D.C. Cir. 1994); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,* 874 F.2d 20, 28 (1st Cir. 1989); *In re Bevill, Bresler & Schulman Asset Mgt. Corp.,* 805 F.2d [120,] 126 [(3d Cir. 1986)]; *Travelers Cas. & Sur. Co. v. Excess Ins. Co.,* 197 F.R.D. 601, 606 (S.D. Ohio 2000); Restatement (Third) of the Law Governing Lawyers § 76(1).

The common interest privilege is not limited to communications and documents generated during the period of time when persons are cooperating on a common defense. It also includes pre-existing confidential communications and documents that are shared during the common enterprise. *In re Grand Jury Subpoenas 89-3 & 89-4, John Doe 89-129*, 902 F.2d at 249-50. Accordingly, when a party invokes the common interest privilege, the court must focus on the circumstances surrounding the disclosure of the communications or documents rather than

on when communications or documents were generated. [Paul R. Rice,] *Attorney-Client Privilege in the United States* § 4:38, at 238 [(2d ed. 1999)].

*Boyd*, 88 S.W.3d at 213-15 (footnotes omitted) (emphasis added).

In response to the motion to compel, Moore Freight filed, *inter alia*, a "Second Affidavit" executed by Mr. Roy on January 21, 2021. Related to the common interest privilege, Mr. Roy stated:

In approximately August 2019, [Moore Freight] discovered that its employee, Grant Mize, had potentially engaged in a bribery scheme, making payments to a key employee of one of [Moore Freight's] customers (the "Customer").

In response to this discovery and at my direction, [Moore Freight] initiated an investigation into the bribery allegations (the "Investigation").

In initiating the Investigation, [Moore Freight] anticipated that the bribery allegations could lead to civil or criminal litigation related to [Moore Freight's] business, [Moore Freight's] employees and its relationship with Customer and Customers' employees.

At my direction, [Moore Freight] retained the law firm of Vinson & Elkins to conduct the Investigation.

At the same time, Customer initiated its own investigation in the bribery allegations, which was conducted in cooperation with [Moore Freight's] investigation.

During the course of the Investigation, information and materials were shared with Customer in furtherance of the common interest of both [Moore Freight] and Customer in avoiding litigation related to the bribery allegations.

(Paragraph numbering omitted.) A complete transcript of the entire January 26, 2021 hearing, which is included in the appellate record, reflects that when Moore Freight's counsel presented materials to the trial court for in camera review, counsel included a copy of a "joint agreement" entered into between Moore Freight and Customer regarding

- 23 -

their purported shared interest in anticipated litigation.  We note that "while the courts may review joint defense agreements in chambers, the agreements are not discoverable by other parties." *Boyd*, 88 S.W.3d at 217 (footnote omitted).  However, Moore Freight's counsel stated that although it was prepared to present the joint agreement to the trial court solely for in camera review, it had provided a copy to Defendants' counsel as well. We note that as with the other materials reviewed in camera by the trial court, the joint agreement is not in the appellate record and is therefore not available for our review. However, pursuant to the analysis that follows, we find review of the joint agreement unnecessary.

In its January 2021 ruling, incorporated into its April 2021 order, the trial court made the following findings, in relevant part, when determining that the common interest privilege did not afford Moore Freight protection over the investigation materials:

> [T]he defendant Mize has contended that [Moore Freight] also waived any privilege by virtue of communications and disclosures to [Customer]. [Moore Freight] asserts that those disclosures do not waive the attorney-client privilege because they fall within the scope of the common interest or joint defense privilege.
>
> As with the burden of showing the application of the attorney-client privilege in general in the first instance, [Moore Freight] has the burden of showing that the common interest or joint defense privilege applies. . . .
>
> All right.  For application of this privilege, the party seeking to invoke the privilege has to show these elements:  that the otherwise privileged information was disclosed due to actual or anticipated litigation, that the disclosure was made for the purpose of furthering a common interest in the actual or anticipated litigation, that the disclosure was made in a manner not inconsistent with maintaining its confidentiality against adverse parties, and that the person disclosing the information has not otherwise waived its attorney-client privilege for the disclosed information.
>
> The common interest agreement itself and Mr. Soumit Roy's affidavit indicate that the common interest privilege may apply but it doesn't apply if [Moore Freight] has placed the information at issue.  So we're back to where we started from.  And of course, if [Moore Freight] has implicitly waived the attorney-client privilege, including work product privileges, by placing them at issue in connection with placing the internal

- 24 -

investigative materials at issue in this case, then the joint interest or common defense – or common interest or joint defense issue makes no difference.

The trial court essentially found that the fourth requirement of the common interest privilege, "that the person disclosing the information has not otherwise waived the attorney-client privilege for the disclosed information," *see Boyd*, 88 S.W.3d at 215, had not been met because Moore Freight had otherwise waived the attorney-client privilege by placing the internal investigation at issue in this action. We agree.

The parties each acknowledge that for what may be referred to as "'at issue' waiver," also known as "implied waiver" of the attorney-client privilege, *see Culbertson II*, 455 S.W.3d at 133, the applicable test in Tennessee was set forth by the Court of Criminal Appeals in *Bryan v. State*, 848 S.W.2d 72, 81 (Tenn. Crim. App. 1992) (citing with approval *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)), and adopted by this Court in *Culbertson II*, 455 S.W.3d at 133 (in the context of applying the underlying attorney-client privilege to the psychologist-client privilege). *See also Outpost Solar, LLC v. Henry, Henry & Underwood, P.C.*, No. M2016-00297-COA-R9-CV, 2017 WL 6729292, at *7 (Tenn. Ct. App. Dec. 29, 2017) (affirming the trial court's "use of the standard set forth in *Bryan* to determine the issue of waiver" of the attorney-client privilege). As the *Bryan* Court stated:

[A] party asserting the attorney-client privilege has impliedly waived it through the party's own affirmative conduct where three conditions exist:

(1)     assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;

(2)     through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and

(3)     application of the privilege would have denied the opposing party access to information vital to his [or her] defense.

*Bryan,* 848 S.W.2d at 81 (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)). Moore Freight argues that although the trial court applied the correct test to determine whether the attorney-client privilege had been waived, it erred in finding that Moore Freight had put the investigation materials at issue through any affirmative act and in finding that the materials were vital to Defendants' defense.

In its January 2021 ruling, incorporated into the April 2021 order, the trial court explained its determination that Moore Freight had put the internal investigation "at issue," stating in pertinent part:

> [Moore Freight] pled in its complaint in paragraph 48 that it terminated the Defendant Mize for cause based upon all the information from an internal investigation. . . . Then [Moore Freight] points to paragraph 42 of its complaint and argues that it was Mr. Mize's admission of his misconduct and also points to Mr. Soumit Roy's affidavit – Mr. Soumit Roy is Daseke's house counsel . . . it was Mr. Mize's admission that was the cause of his termination. However, paragraph 48 says what it says, and the affidavit of Mr. Scott Hoppe, the CEO of an affiliate, filed October 13 of 2020, I believe, states that the termination was made at the conclusion of the investigation.
>
> All right. If [Moore Freight] did not discharge Defendant Mize for cause, then arguably [Moore Freight] would remain liable under its contract for about $600,000 to Mr. Mize and may have breached the contract first and – that's in the event that this were to be determined – relieved Mr. Mize from the non-competition provisions.
>
> [Mr. Mize], on the other hand, raised that his discharge was pretextual and was in actuality part of an intra-corporate plan to eliminate Mr. Mize's position as part of a corporate consolidation.
>
> Mr. Mize filed a counterclaim, and [Moore Freight] included as part of its answer and defenses that Mr. Mize was terminated not because of a planned intra-corporate consolidation but that [Moore Freight] commenced an internal investigation that resulted in Mr. Mize's termination.
>
> The Court finds and concludes prima facie that [Moore Freight] has placed the internal investigation at issue. The Court does not believe that [Moore Freight] can use the internal investigation information as supplying the reason for Mr. Mize's termination and then assert that the defendant or defendants cannot have access to the very same information. Moreover, it is that specific information that [Moore Freight] relied upon in terminating Mr. Mize.

Mr. Mize contends that the whole thing was a pretext. It's important to see the very information, the same information, being all the information from the investigation as alleged in paragraph 48 of the complaint, that [Moore Freight] relied upon in terminating Mr. Mize.

Upon our thorough review of the record, we agree with the trial court.

Moore Freight argues that its "oblique references to the existence of an internal investigation do not invoke the privileged communications as a basis for relief, let alone constitute an 'affirmative act' to put the internal investigation at issue." We do not find Moore Freight's references to the internal investigation in the record to have been oblique. As noted above in the trial court's order and in our earlier analysis of the initial relevancy of the requested discovery, Moore Freight stated in paragraphs 47 to 48 of the complaint that Mr. Hoppe, Mr. Roy, "and others reviewed the details disclosed by the investigation" and that "[a]fter reviewing all of the information available, it was determined," *inter alia*, that Mr. Mize's employment should be terminated. Moore Freight asserts, however, that the decision to terminate Mr. Mize's employment was made based solely on his admitted conduct concerning the payment scheme.

The trial court noted Moore Freight's argument that paragraph 42 of the complaint indicated that Mr. Mize's employment was terminated due to "additional details" provided by Mr. Mize through his witness statement and due to his "suspected conduct."[7] As the trial court further noted, Mr. Roy stated in his second affidavit filed with the court that Mr. Mize "was terminated by [Moore Freight] in November 2019 as a result of the admitted conduct by Mr. Mize and the potential harm to [Moore Freight] arising therefrom." However, Mr. Roy also testified during his deposition that in September, October, and November of 2019, "[w]e were investigating misconduct regarding Mr. Mize," stating that "subsequent to that investigation, we separated our relationship with Mr. Mize" (emphasis added). As Defendants point out, although Mr. Mize initially disclosed the payment scheme to Mr. Hoppe in August 2019, he added detailed information in his October 2019 witness statement on which Moore Freight now relies in this action, and Mr. Mize's witness statement was given at the request of Vinson & Elkins as part of the internal investigation. Having utilized the witness statement in

---

[7] The copy of the complaint provided in the record appears to have been made with a post-it note covering the right side of paragraphs 41, 42, and 43. However, the phrases quoted above are legible, and we also have been able to glean the gist of paragraph 42 from references to it in the record. We note that the responsibility for providing a complete record to this Court lies with the appellant. *See Kries v. Kries*, No. E2004-00132-COA-R3-CV, 2004 WL 2709207, at *2 (Tenn. Ct. App. Nov. 29, 2004) ("[I]t is the appellant's responsibility to assure that the record is accurate and adequate to allow the Court to review and dispose of the issues.").

support of its claim that Mr. Mize's employment was terminated for cause, Moore Freight has subsequently claimed that the remainder of the materials from the same investigation are protected by the attorney-client privilege.

The trial court found that Mr. Mize had asserted as a defense that "his discharge was pretextual and was in actuality part of an intra-corporate plan to eliminate [his] position as part of a corporate consolidation." In his answer and counterclaim, Mr. Mize did not use the term, "pretext." However, Mr. Mize did aver in his answer that when "Daseke's stock price fell significantly during the general period after Daseke purchased [Moore Freight]," "Daseke undertook some restructuring, which included doing away with and/or consolidating some senior positions," and that "[s]oon thereafter," Mr. Mize's "position was terminated," and "his responsibilities were folded into another executive's job in the Daseke organization."

Mr. Mize alleged as a defense that the Employment Agreement's noncompetition clause was unenforceable and had not been part of his original agreement with Daseke. Additionally, Mr. Mize alleged that Moore Freight had committed the first material breach of an agreement, part of both the Employment Agreement and what Mr. Mize claimed was his understanding with Daseke, that Mr. Mize would remain employed at an annual base salary of $200,000 per year for a minimum of five years, approximately three years beyond the date that his employment was eventually terminated. In so alleging, Mr. Mize averred that he had "fully performed all his obligations under the agreement." Subsequently, in Defendants' motion to compel the investigation materials, Defendants asserted that the materials were "directly relevant to Mr. Mize's defense that his termination was pretextual and that [Moore Freight's] demoting or removing him as CEO of [Moore Freight] and ultimately terminating him constitute first material breaches of his employment agreement."[8]

The trial court found that Moore Freight affirmatively placed the investigation at issue not only in  its complaint but also in its response to Mr. Mize's answer and its answer to Mr. Mize's counterclaim. In its answer, Moore Freight specifically denied Mr. Mize's assertion that his employment termination had been prompted by corporate restructuring that included eliminating or consolidating managerial positions. Acknowledging the restructuring process, Moore Freight stated in part:

---

[8] Moore Freight posits that "a 'pretext' argument" is not appropriate because "a breach of contract is **not** synonymous with a Title VII sexual harassment claim," citing *Reitz v. City of Mt. Juliet*, 680 F. Supp. 2d 888, 892 (M.D. Tenn. 2010). We do not find that Defendants' and ultimately the trial court's utilization of the term, "pretext," in a descriptive manner equates to an effort to analogize the internal investigation in the instant action to an investigation of a Title VII sexual harassment claim.

[Moore Freight] admits that its stock price fell in the period following Daseke's acquisition of [Moore Freight]. [Moore Freight] further admits that, as is typical following most M&A [merger and acquisition] transactions, some restructuring at [Moore Freight] took place. However, [Moore Freight] denies that Mize's employment was terminated due to either the decrease in stock price or as a result of any corporate restructuring at [Moore Freight]. Answering further, [Moore Freight] avers that Mize was intended to maintain a key position at [Moore Freight] throughout his employment term and possibly beyond, as indicated by his "CEO in waiting" designation, following the Daseke acquisition. [Moore Freight] further avers that Mize's employment was terminated for cause based on his involvement in, and propagation of, the payment scheme described above, which he admitted to. [Moore Freight] admits that, as a result of having to terminate Mize, it became necessary for [Moore Freight's] management to be folded into that of E.W. Wylie Corporation – another Daseke company – but that would not have been necessary but for Mize's own acts and/or omissions.

(Emphasis added.) Moore Freight relies on its statements such as the one underlined above to maintain that it was Mr. Mize's actions that resulted in his employment termination rather than the investigation. However, in the same set of responses, Moore Freight stated:

[Moore Freight] . . . admits that Mize first addressed the payment scheme during an informal conversation with [Mr. Hoppe] in July 2019 and avers that it was after this disclosure that the internal investigation resulting in Mize's and [another employee's] termination began.

(Emphasis added.)

Moreover, in Mr. Roy's November 2019 termination letter to Mr. Mize, which was filed by Moore Freight as an exhibit to an affidavit, Mr. Roy stated that Moore Freight had "conducted a thorough investigation, which included open admissions by you and others of misconduct that occurred," again citing the investigation as completed prior to the decision to terminate Mr. Mize's employment. In this letter, Mr. Roy "acknowledge[d]" Mr. Mize's "assistance with the Company's investigation" while informing Mr. Mize of Moore Freight's conclusion, clearly made after the investigation,

- 29 -

that Mr. Mize had "engaged in conduct materially injurious to the Company deemed as willful misconduct in the performance of [his] duties."

We agree with the trial court's conclusion that Moore Freight cannot "use the internal investigation information as supplying the reason for Mr. Mize's termination and then assert that the defendant or defendants cannot have access to the very same information." Pursuant to the first two elements of the at-issue waiver analysis, Moore Freight's affirmative acts have placed the internal investigation at issue as relevant to this action.

The final element of at-issue waiver in this instance is whether application of the attorney-client privilege would have denied Defendants access to information vital to their defense. *See Culbertson II*, 455 S.W.3d at 133 ("In the case of an 'at issue' waiver, application of the privilege would deny the opposing party information that is 'vital' to his defense." (quoting *Culbertson I*, 393 S.W.2d at 685 (in turn quoting *Bryan,* 848 S.W.2d at 81))). In great part, Moore Freight relies on its assertion that Mr. Mize's employment termination was due to his actions, rather than to the results of the internal investigation, to contend that the investigation materials are not vital to Mr. Mize's defense because he already has knowledge of his own oral statements and has a copy of the witness statement, which Moore Freight insists are all the termination was based upon. Having determined that Moore Freight placed the investigation materials at issue, we further determine this argument to be unavailing.

Moore Freight also argues that all of the witnesses interviewed by Vinson & Elkins are available to Defendants and that Defendants therefore do not require access to the investigation materials to discover what these witnesses stated about the payment scheme. However, access to witnesses interviewed for the internal investigation years after the investigation concluded would not reliably inform Defendants of what those witnesses told the investigators or how those interviews impacted the investigation. The trial court was correct in finding that it is important to Mr. Mize's defense "to see the very information, the same information, being all the information from the investigation as alleged in paragraph 48 of the complaint, that [Moore Freight] relied upon in terminating Mr. Mize."

We note that the trial court stated at the close of its ruling on the attorney-client and common interest privileges that it had "referred to cases such as *Morristown Heart Consultants, PLLC v. Patel*." *See* No. E2018-01590-COA-R9-CV, 2019 WL 3318184 (Tenn. Ct. App. July 24, 2019). Moore Freight argues that the trial court's "reliance on *Morristown* as primary authority for its determination of waiver is erroneous as the case

- 30 -

is inapposite to the current case." Although we agree that the facts of *Morristown Heart Consultants* are distinguishable from those in the instant action, we do not find that the trial court erred in its reference to the decision. In *Morristown Heart Consultants*, this Court held that the plaintiff corporation "waived its attorney-client privilege and [could not] enforce said privilege against [the defendant physician], who owned fifty-percent financial rights and thirty-three percent governing rights to [the corporation] at all relevant times." 2019 WL 3318184, at *7. In so holding, this Court emphasized that "this holding does not extend to make privileged communications between a PLLC and its attorney accessible to outside persons or entities or even other members of a PLLC under factual circumstances differed from those in this case." *Id.* Clearly, the factual situation of a defendant who had been an owner of the plaintiff corporation is distinguishable from the factual situation in the instant action.

However, in *Morristown Heart Consultants*, a relatively recent decision, this Court also provided a detailed description of the legal precedent underpinning waiver of the attorney-client privilege in Tennessee, citing with approval, *inter alia*, the requirements for the privilege outlined in *State ex rel. Flowers*, *see Morristown Heart Consultants*, 2019 WL 3318184, at *6 (citing *State ex rel. Flowers*, 209 S.W.3d at 616), and the *Culbertson I* Court's quotation of the *Bryan* at-issue waiver test, *see Morristown Heart Consultants*, 2019 WL 3318184, at *7 (quoting *Culbertson I*, 393 S.W.3d at 684-84). Moreover, as Defendants point out, the trial court stated that it had "referred to cases such as" *Morristown Heart Consultants*, indicating that this reference was an example of a line of Tennessee decisions describing the precedent underlying potential waiver of the attorney-client privilege.

The trial court did not err in finding that Moore Freight had affirmatively placed the internal investigation at issue. We conclude that Defendants met their burden to establish that Moore Freight impliedly waived its attorney-client and common interest privileges as to the internal investigation materials.

### B. Work Product Doctrine

As this Court has explained regarding the work product doctrine:

The central purpose of the work product doctrine is to protect an attorney's preparation for trial under the adversary system. The policy underlying the doctrine is that lawyers preparing for litigation should be permitted to assemble information, to separate the relevant facts from the irrelevant, and to use the relevant facts to plan and prepare their strategy without undue

- 31 -

and needless interference. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 219-20 (Tenn. Ct. App. 2002). Thus, the doctrine protects parties from "learning of the adversary's mental impressions, conclusions, and legal theories of the case," *Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d [681,] 689 [(Tenn. 1994)], and prevents a litigant "from taking a free ride on the research and thinking of his opponent's lawyer." *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999).

While the work product doctrine is most frequently invoked in civil cases, it has a vital role in assuring the proper functioning of the criminal justice system. *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170, 45 L. Ed. 2d 141 (1975). Thus, the work product doctrine applies to both civil and criminal proceedings, although not necessarily in the same fashion. *Coe v. State,* 17 S.W.3d 193, 214 (Tenn. 2000); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 219. The work product doctrine has now been codified in procedural rules. Tenn. R. Civ. P. 26.02(3) embodies the version of the doctrine applicable to civil proceedings.

*Swift v. Campbell*, 159 S.W.3d 565, 572-73 (Tenn. Ct. App. 2004) (applying the corresponding rule of criminal procedure in a case involving a public records request).

The civil procedural rule embodying the work product doctrine, Tennessee Rule of Civil Procedure 26.02(3), provides as follows in pertinent part:

**TRIAL PREPARATION: MATERIALS.** Subject to the provisions of subdivision (4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

As noted in the previous section of this Opinion, "[o]nce the party seeking discovery establishes a prima facie showing that the materials it sought were discoverable, the burden shifts to the party opposing discovery to show that the materials were either privileged or work product protected by Tenn. R. Civ. P. 26.02(3)." *State ex rel. Flowers*, 209 S.W.3d at 617 (citing *Boyd,* 88 S.W.3d at 220-221). We have determined that the trial court did not err in finding that Defendants made a *prima facie* showing that the investigation materials are discoverable and that Moore Freight waived the attorney-client and common interest privileges. As to work product, Defendants do not dispute that the investigation materials contain work product in that they were created through the work that Moore Freight retained Vinson & Elkins to perform. Moore Freight has therefore met its burden of showing that the investigation materials contain work product. The burden has then shifted as to work product to Defendants to demonstrate that they are nonetheless entitled to the materials. *See State ex rel. Flowers*, 209 S.W.3d at 618 ("If it is established that a portion of the requested documents are work product, the burden shifts back to the party requesting discovery to establish that it is nonetheless entitled to the material." (citing *Boyd*, 88 S.W.3d at 221)).

At this point, a distinction between the burden involved in obtaining discovery of "'ordinary' or 'fact' work product" versus "'opinion' work product" becomes important to our analysis of the certified question in this action. *See Boyd*, 88 S.W.3d at 221. As the *Boyd* Court delineated:

> The nature and extent of this burden depends upon whether the material is "ordinary" or "fact" work product or "opinion" work product. Ordinary or fact work product consists of documents prepared in anticipation of litigation or for trial that do not contain the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party in the litigation. *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 512 (D.N.H. 1996); *Moore's Federal Practice* § 26.70[5][b]. Opinion work product includes documents containing an attorney's mental impressions, conclusions, opinions, or legal theories regarding the pending litigation. *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997); Restatement (Third) of the Law Governing Lawyers § 87(2).
>
> To obtain ordinary or fact work product, the requesting party must establish (1) that it has a substantial need for the materials and (2) that it is unable to obtain these materials or their substantial equivalent by other means without undue hardship. Tenn. R. Civ. P. 26.02(3); *In re Perrigo*

- 33 -

*Co.*, 128 F.3d 430, 437 (6th Cir. 1997); *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994); *Miller v. Federal Express Corp.*, 186 F.R.D. [376,] 387 [(W.D. Tenn. 1999)]; *Beard v. Middle Tenn. Home Health Serv.*, 144 F.R.D. 340, 342 (E.D. Tenn. 1992). The basis for the claim of "substantial need" must be articulated with specificity. *In re Grand Jury Investigation (Sun Oil)*, 599 F.2d 1224, 1232 (3d Cir. 1979); *Delco Wire & Cable, Inc. v. Weinberger*, 109 F.R.D. 680, 689-90 (E.D. Pa. 1986); [Edna S.] Epstein, [*The Attorney-Client Privilege and the Work-Product* Doctrine] 550 [(4th ed. 2001)]. As a general matter, the party seeking discovery must establish that the facts in the requested documents are essential elements of its prima facie case. *Moore's Federal Practice* § 26.70[5][c].

The burden of establishing a need for opinion work product is more onerous than that for ordinary or fact work product. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992). The United States Supreme Court has emphasized that the essential purpose of the work product doctrine is to protect an attorney's mental processes, *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S. Ct. 1060, 1065, 149 L. Ed. 2d 87 (2001), and that work product revealing an attorney's mental processes is "deserving of special protection." *Upjohn Co. v. United States*, 449 U.S. 383, 400, 101 S. Ct. 677, 688, 66 L. Ed. 2d 584 (1981). While the Court has, thus far, declined to hold that opinion work product is never discoverable, it has held that parties seeking opinion work product must make a "far stronger showing of necessity and unavailability by other means" than is required when seeking ordinary or fact work product. *Upjohn Co. v. United States*, 449 U.S. at 401-02, 101 S. Ct. at 688-89.

The courts have not defined precisely when revealing opinion work product is warranted. A majority of courts have pointed out that it enjoys a nearly absolute immunity from disclosure, *Baker v. General Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000); *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999); *Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997); *P. & B. Marina, Ltd. P'ship v. Logrande*, 136 F.R.D. 50, 57 (E.D.N.Y. 1991), and that it is subject to discovery only in rare, extraordinary circumstances. *Hickman v. Taylor*, 329 U.S. [495,] 513 [(1947)], 67 S. Ct. [385,] 395; *Gundacker v. Unisys Corp.*, 151 F.3d 842, 848 (8th Cir. 1998); *In re Sealed Case*, 856 F.2d 268, 273 (D.C. Cir. 1988); Restatement (Third) of the Law Governing

Lawyers § 89. These circumstances include those in which the litigation itself or one of the litigants puts the attorney's work product at issue by asserting claims or defenses based on the "advice of counsel," by calling an attorney as an expert witness, or another circumstance in which an attorney's conduct is a central issue in a case. Epstein, at 574 & 589; Restatement (Third) of the Law Governing Lawyers § 92.

*Id.* at 221-22 (footnote omitted).

In its January 2021 ruling, incorporated into the April 2021 order, the trial court noted that Moore Freight had "raise[d] that much of the investigation materials or investigating materials are work product, including opinion work product which is almost never discoverable." Referencing *Boyd*, the trial court then stated, however, that "a situation where it becomes discoverable is where the litigant has placed it at issue." Moore Freight argues that the trial court erred by conflating the *Bryan* at-issue test for attorney-client privilege with the example noted in *Boyd* of "rare and extraordinary circumstances" when opinion work product may become discoverable, in other words, when "the litigation itself or one of the litigants puts the attorney's work product <u>at issue</u> by asserting claims or defenses based on the 'advice of counsel,' by calling an attorney as an expert witness, or another circumstance in which an attorney's conduct is a central issue in a case.'" *Id.* at 222 (emphasis added).

The phrase that the trial court utilized in this part of its ruling, "placed it at issue," is somewhat unclear. However, we discern any error in this regard to have been harmless because the trial court did not ultimately enter an order compelling the discovery of any opinion work product. The court, properly exhibiting caution in deciding whether Moore Freight should be compelled to produce work product, examined in camera solely what Moore Freight was prepared to present to the court on January 26, 2021, which undisputedly consisted of fact work product alone.

In its April 2021 order, the trial court summarized its findings during the January 2021 hearing, decision to review the materials *in camera*, and what materials were reviewed as follows:

> At the conclusion of the January 26, 2021 hearing, the Court found prima facie that [Moore Freight] had put the internal investigation "at issue" in the litigation, waiving any protection under the attorney-client, work product, or common interest or joint defense privileges or protections that would otherwise apply to information and documents concerning or relating to the

internal investigation. The Court determined, however, that considering the nature of those privileges or protections, before any materials related to the internal investigation were turned over to Defendants, the Court would review them in camera, in light of the applicable privilege law and the common interest agreement introduced by [Moore Freight].

At the January 26, 2021 hearing, [Moore Freight] provided the Court with two accordion folders of materials that contained documents labeled "VE BINDERS 001-375" and "VE_AGCPRIV 001-681." Counsel for [Moore Freight] informed the Court that these folders did not contain all the materials relating to the internal investigation. In particular, the folders did not contain what counsel for [Moore Freight] described as certain "opinion work product" of the outside counsel for [Moore Freight] that conducted the investigation, such as memos of interviews. The Court decided, however, to proceed with an in camera review of the materials provided on January 26, 2021, with Defendants reserving the right to seek production of all other materials related to the investigation if the Court ultimately ordered the materials in the folders to be turned over to Defendants.

We note that the materials reviewed by the trial court in camera and identified in its order above have not been provided by Moore Freight to this Court for review. However, inasmuch as Moore Freight does not dispute that the materials examined by the trial court contain fact work product but no opinion work product, we determine that we are able to continue with our review of the certified question on interlocutory appeal despite the absence of the materials in the record before us.

In granting the motion to compel, the trial court found that "the materials given to the Court on January 26, 2021 for an *in camera review* should be turned over to Defendants in their entirety." Additionally, the trial court directed that "Defendants may seek the additional materials referenced by [Moore Freight's] counsel at the January 26, 2021 hearing, but not produced for *in camera* review, upon further motion to this Court." Moore Freight argues that the court's order indicates that it will grant any such motion filed by Defendants. Accordingly, Moore Freight asks this Court to decide the issue of whether it should be compelled to produce opinion work product related to the internal investigation. This we decline to do. The trial court has not reviewed any opinion work product and has made no decision that such must be produced. *See Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976) ("This is a court of appeals and errors, and we are limited in authority to the adjudication of issues that are presented and decided in the trial courts[.]").

Returning to the question of whether Defendants were entitled to obtain fact work product related to the internal investigation, Defendants were required to establish (1) that they had "a substantial need for the materials" and (2) that they were "unable to obtain these materials or their substantial equivalent by other means without undue hardship." *See Boyd*, 88 S.W.3d at 221. Although in its order compelling the materials the trial court did not employ the exact phrases quoted here from *Boyd*, we determine that the court's finding that "[i]t's important to see the very information, the same information, being all the information from the investigation as alleged in paragraph 48 of the complaint, that [Moore Freight] relied upon in terminating Mr. Mize," amounted to a finding that Defendants had a substantial need to obtain the investigation materials because the investigation had been put at issue as the cause for Mr. Mize's termination, as explained fully in the previous section of this Opinion. Similarly, although Moore Freight argues that Defendants could essentially recreate the investigation by interviewing the same individuals interviewed by Vinson & Elkins, as we have previously determined, this would not be what the trial court termed, "the very same information," because it is the effect of the internal investigation on Moore Freight's decision to terminate Mr. Mize's employment that has been put at issue.

Moore Freight asserts that Defendants have not demonstrated that "the facts in the requested documents are essential elements of [their] prima facie case." *See id.* at 221-22. We disagree. The internal investigation is central to Mr. Mize's defense that Moore Freight's stated cause of his employment termination was pretextual and also, therefore, central to Mr. Mize's claim that Moore Freight committed the first material breach of the Employment Agreement. Moreover, we agree with the trial court's conclusion that Moore Freight cannot "use the internal investigation information as supplying the reason for Mr. Mize's termination and then assert that the defendant or defendants cannot have access to the very same information." *See Arnold v. City of Chattanooga*, 19 S.W.3d 779, 787 (Tenn. Ct. App. 1999) ("Courts have universally held that a party is prevented from invoking the work product doctrine immunity as both 'sword and shield[.'"]) (internal citations and footnote omitted). Upon careful review and specific to the fact work product materials covered by the trial court's April 2021 order, we conclude that the trial court did not err in finding that Moore Freight had waived protection of those materials.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's April 2021 interlocutory "Order Granting Defendants' Motion to Compel Production of Internal Investigation

Materials." We specifically determine that the trial court did not err in finding that Moore Freight had waived the attorney-client and common interest privileges as to the internal investigation materials by placing the investigation at issue. We further determine that the trial court did not err in finding that Moore Freight had waived protection over the fact work product materials reviewed in camera by the trial court prior to entry of its April 2021 order. We expressly make no determination regarding any opinion work product materials, which had undisputedly not been produced for review by Moore Freight at the time of this appeal. We remand this case to the trial court for enforcement of its interlocutory order and further proceedings consistent with this Opinion. Costs on appeal are taxed to the appellant, Moore Freight Services, Inc.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE